**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| REVIVAL DEFENSE LLC,<br><br>Plaintiff,<br><br>-against-<br><br>EBF HOLDINGS, LLC d/b/a EVEREST BUSINESS FUNDING, and SCOTT CROCKETT,<br><br>Defendants. | Case No.: ____________ |

## COMPLAINT

Plaintiff Revival Defense LLC ("Revival"), by its attorneys, Heskin & Proper, PLLC, alleges against Defendants EBF Holdings, LLC d/b/a Everest Business Funding ("Everest" or "EBF") and Scott Crockett ("Crockett"), upon personal knowledge as to its own acts and records and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. This action concerns a single funding enterprise's use of two incompatible legal identities. For most of the country, Everest says it buys future receivables from a New York place of business. For Texas, after Texas regulated sales-based financing, Everest says it makes a Utah loan that was approved, made, funded, and accepted entirely in Utah.

2. The documents show that neither story describes economic reality. From September 2022 through March 2026, Everest placed Revival on a continuous rollover treadmill: six documents labeled revenue-based purchases, followed by two documents concededly labeled commercial loans.

3. Every transaction advanced a fixed amount, imposed a fixed face balance, authorized fixed weekday ACH debits, and mathematically retired that balance in a predictable number of payments. Each renewal diverted a substantial part of the new advance to satisfy Everest's old balance before Revival received a dollar.

4. Across the six purported purchases, Everest advanced $560,000 gross, withheld $10,740 in fees, diverted $182,145.95 to its own prior balances, and required $764,600 in total repayment. The resulting finance charges were $215,340.

5. Everest then converted the same relationship into a November 20, 2025 loan. It stated $200,000 in principal and $66,000 in precomputed interest, charged a $2,645 upfront fee, diverted more than $112,000 to its prior balance, and demanded $266,000 through 235 fixed weekday debits. Everest did not reduce those contract terms when Shield Funding later covered the $2,645 fee from its broker commission.

6. On March 19, 2026, Everest refinanced that loan. It stated $295,000 in principal and $94,400 in precomputed interest, withheld $3,345 in fees, diverted $169,739.89 to its own prior balance, and delivered only $121,915.11 in new cash while demanding $389,400 through 260 fixed weekday debits.

7. On an actuarial basis using the stated payment schedules and net amounts financed, the two Texas loans carry estimated nominal annual rates of approximately 69.5% and 60.7%. Each exceeds twice the 18% Texas commercial-credit ceiling in effect when contracted.

8. The transaction sequence is the hamster wheel described in other MCA cases: the daily debit drains working capital; the merchant refinances to keep up; the funder pays itself first from the new advance; and the merchant receives less new cash while the face balance grows.

9. Everest's reconciliation language does not transfer receivables risk. It permits only one request per month, demands a completed bank statement and any additional information Everest requests, and makes any adjustment only prospectively after Everest's verification. It does not require a refund or retrospective true-up when Everest has taken more than the stated percentage.

10. Everest's actual 2026 response to hardship confirms the point. It said it would not pause or stop payments. A temporary reduction would merely create a past-due amount to be repaid later by lump sum or additional installments. Reduced receipts changed timing, not the fixed debt.

11. The modification form compounded the admission. Although Revival's operative contract was expressly a Commercial Loan and Security Agreement, Everest's form called Revival the "Seller," called Everest the "Buyer," and incorporated the modification into a "Revenue Based Financing Agreement."

12. Everest's public marketing makes the opposite promise: it states that revenue-based payments are not fixed, are tied to revenue, and adjust automatically when business slows. The contract, renewal history, and collections emails show that those statements do not describe Everest's program as applied to Revival.

13. Everest also knew Revival was stacked with other daily-debit financing. Everest requires months of bank statements and deposit-account access, yet funded while Redwood Business Loans positions remained active. Everest's own collector later asked what Redwood was doing to assist Revival.

14. No public Everest underwriting guideline located before filing expressly uses the word "stacking." The primary records are more probative: Everest reviewed the bank activity,

repeatedly approved overlapping positions, took blanket liens behind or alongside other funders, and treated Redwood as part of the workout.

15. Texas enacted Chapter 398 of its Finance Code effective September 1, 2025. The statute removes commercial sales-based financing from the account-purchase safe harbor and prohibits recurring deposit-account debits unless the provider holds a validly perfected first-priority security interest.

16. Seventy-nine days later, Everest stopped using its New York-law revenue-purchase form for Revival and substituted a Utah-law loan form. Everest's own website now says it is "Proudly Offering Business Term Loans for Texas Businesses" and describes the product as an upfront amount repaid over a set period.

17. The Utah recital is a device to avoid the consequences of both classifications. If the transaction is a loan, Texas's constitutional and statutory usury law governs a Texas borrower, Texas business, Texas bank account, and Texas performance. If it is sales-based financing, Chapter 398 governs and the first-priority-debit restriction applies.

18. Everest's official public filing identifies its principal address as 102 West 38th Street, Sixth Floor, New York, New York. Its six MCA contracts used that New York address and selected New York law. Its public website and parent-company records identify substantial New York and Florida operations. The Utah loan form alone recites that everything legally relevant happened in Utah.

19. *Fleetwood Services, LLC v. Complete Business Solutions Group, Inc.*, 374 F. Supp. 3d 361, 370–72 (E.D. Pa. 2019), rejected the same kind of contractual evasion at the pleading stage. It held that Texas had the materially greater interest and that applying the chosen state's law would violate Texas's fundamental policy against commercial usury, embodied in

article XVI, section 11 of the Texas Constitution and Finance Code sections 303.009 and 305.001.

20. New York likewise has a direct interest in the conduct of a New York-centered funding business. The First Department recently confirmed that New York law reaches New York-based MCA businesses even when their victims are elsewhere, and that fixed payments, nonfunctioning reconciliation, guarantees, and default remedies can establish disguised loans and personal control-person liability. *People v. Richmond Capital Group LLC*, 246 A.D.3d 585, 585–88 (1st Dep't 2026).

21. The newer record also supplies the facts missing from earlier Everest cases. *U.S. Information Group LLC v. EBF Holdings, LLC*, No. 22-cv-6661 (PKC), 2023 WL 6151492 (S.D.N.Y. Sept. 22, 2023), dismissed a complaint that ignored the reconciliation clause and omitted facts addressing important true-sale factors. This Complaint pleads the clause, its prospective-only operation, the exact payoff periods, six rollovers, Everest's actual no-pause and arrears policy, stacking knowledge, and the later loan-form conversion.

22. *Streamlined Consultants, Inc. v. EBF Holdings, LLC*, No. 21-cv-9528 (KMK), 2022 WL 4368114 (S.D.N.Y. Sept. 20, 2022), and the later sanctions decision likewise arose from pleadings and contracts predating the 2025–2026 operational evidence and the intervening decisions in *People v. Richmond* and *Togut v. eProdigy Financial, LLC (In re Kossoff PLLC)*, 2026 Bankr. LEXIS 1850 (Bankr. S.D.N.Y. July 27, 2026).

23. The divided decision in *EBF Holdings, LLC v. Defiant Arms, L.L.C.*, 2026 NY Slip Op 04563 (4th Dep't July 24, 2026), concerned one weekly-payment contract and relied on its facial reconciliation, no-term, and bankruptcy language. It did not address the complete

course of dealing pleaded here. Two justices would have found triable loan issues based on the estimated-payment and guaranty evidence even on that record.

24. Revival seeks RICO damages for collection of unlawful debt, declaratory relief, restitution in the alternative, an accounting, and relief preventing Everest from enforcing unlawful balances, debits, liens, guaranties, and choice-of-law provisions against Revival.

## JURISDICTION AND VENUE

25. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) because Revival asserts claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968.

26. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the related New York and Texas claims because they arise from the same standardized funding, renewal, debit, and collection program.

27. The Court may declare the parties' rights under 28 U.S.C. §§ 2201 and 2202. An actual controversy exists because Everest continues to debit and claim a balance under the March 19, 2026 loan, asserts liens and guaranty rights, and may pursue enforcement remedies.

28. Venue is proper under 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b). Everest's official principal address is in this District; Everest used a New York address in each MCA agreement; material origination, approval, administration, renewal, and collection conduct occurred in or was directed through this District; and interstate DocuSign, ACH, email, and funding transmissions passed through the enterprise's New York operations.

29. Everest expressly selected New York law for the six MCA transactions and authorized Everest, at its election, to sue in New York. That unilateral enforcement option cannot deprive this Court of venue over Revival's federal claims.

30. The Utah clauses in the two Texas loan forms do not defeat venue. The clause in the borrower agreement selects law but does not make Utah the exclusive judicial forum; the guaranty's forum language is challenged with the underlying unlawful loan and does not bar Revival's individual RICO claims against Crockett.

31. This Court has personal jurisdiction over Everest because Everest maintains its official principal address in New York, repeatedly used a New York contracting address, selected New York law for its national program, transacts substantial business here, and purposefully directs a nationwide funding enterprise from New York and related offices.

32. This Court has personal jurisdiction over Crockett because he is Everest's manager, founder, chief executive officer, and controlling mind; directs or ratifies the New York-centered funding program; and caused the standardized transactions and collections alleged below.

33. RICO also authorizes nationwide service and jurisdiction where the ends of justice require it. 18 U.S.C. § 1965.

## PARTIES

34. Plaintiff Revival Defense LLC is a Texas limited liability company with its principal place of business in Midlothian, Texas.

35. Revival provides business services and operates from Texas. Its revenue, deposit accounts, employees, assets, and the economic effects of Everest's debits are centered in Texas.

36. Revival entered all eight challenged Everest transactions. It paid the six MCA balances and the November 2025 loan through ACH debits and rollover payoffs, and it remains subject to Everest's March 2026 loan and July 2026 modification.

37. Defendant EBF Holdings, LLC is a Delaware limited liability company doing business as Everest Business Funding and Everest Business Funding, LLC.

38. Everest's official Florida foreign-entity filing lists the cross-reference names EBF Holdings, LLC and Everest Business Funding, LLC, identifies the entity as active, and states its principal address as 102 West 38th Street, Sixth Floor, New York, New York 10018.

39. The same official filing identifies Crockett as Everest's manager. Everest's records list a mailing address at 12496 N.W. 25th Street, Miami, Florida.

40. Everest used 102 West 38th Street, Sixth Floor, New York, New York 10018 as its notice and business address in the six MCA transactions at issue.

41. Everest used 756 East Winchester Street, Suite 301, Murray, Utah 84107 in the two post-September 2025 Texas loan forms. As of August 21, 2026, EBF's NMLS Consumer Access record listed no branch locations and did not identify that Utah address.

42. Everest originates, underwrites, funds, services, renews, modifies, and collects revenue-based financing and business term loans through a nationwide network of ISOs, ACH processors, bank-data providers, employees, affiliates, and agents.

43. Defendant Scott Crockett is a natural person and, upon information and belief, resides in Florida and transacts substantial business in New York.

44. Crockett is Everest's founder, chief executive officer, manager, operational controller, and the culpable natural person who directs the enterprise.

45. The Federal Trade Commission's official 2019 merchant-cash-advance forum agenda identified Crockett as "Founder & CEO, Everest Business Funding." Current official entity filings identify him as Everest's manager and as chief executive officer of Whetstone Holdings Florida LLC, the parent or controlling affiliate of Everest.

46. A March 2026 New York court record identifies Whetstone Holdings, LLC as Everest's parent. Everest has also filed federal corporate disclosures identifying Whetstone as its corporate parent.

47. Crockett establishes, authorizes, or ratifies Everest's product classifications, underwriting standards, pricing, form agreements, choice-of-law positions, renewal and payoff practices, ACH collection, reconciliation policy, stacking tolerance, security interests, guaranties, and enforcement strategy.

48. Crockett had final or ultimate authority to cause Everest to stop originating New York-law MCA forms for this Texas borrower and begin using a Utah-law term-loan form after Chapter 398 took effect.

49. Crockett benefited from the challenged conduct through ownership, compensation, distributions, enterprise value, and increased funding and collection volume.

50. The identities of additional ISO, ACH-processing, bank-data, servicing, and capital-source participants are peculiarly within Defendants' knowledge. Revival will seek leave to amend if discovery shows that any such participant is independently liable.

## FACTUAL ALLEGATIONS

### A. Everest's Standardized Funding and Collection Enterprise

51. Everest's enterprise is not limited to signing paper. It markets to merchants, recruits ISOs, receives applications, reviews bank statements, prices risk, transmits standardized contracts, wires advances, initiates recurring ACH debits, renews balances, modifies collections, files liens, and pursues defaults.

52. Everest's ISO page states that it has funded more than $3.4 billion through more than 1,800 partners and that renewals pay commission on the full amount rather than only the new cash delivered to the merchant.

53. In a 2023 public industry interview, Crockett stated that approximately 85% to 90% of Everest's originations came from broker partners, confirming that the ISO channel is central to Everest's funding enterprise.

54. That commission structure rewards gross refinancing volume even when most of a renewal advance is retained to retire Everest's own prior balance.

55. Everest requires an application and three to four months of business checking statements for a merchant referral. Its public materials state that approval is based on daily cash flow and revenue performance.

56. For Revival's renewals, Everest also required continuing bank-account visibility through Plaid. Everest could *see* deposits, withdrawals, and competing daily debits rather than relying only on static statements supplied at origination.

57. Everest therefore possesses the information necessary to identify existing daily ACH positions, calculate the merchant's aggregate daily burden, and know whether the transaction is stacked.

58. The challenged agreements carry Everest ISO number 142 and internal application or account-reference numbers. Upon information and belief, ISO No. 142 and other participants transmitted Revival's information and were compensated from the transaction volume.

59. Everest required Revival to use a designated deposit account, authorized recurring weekday debits, obtained continuing account access, and extended authorization to alternate accounts.

60. Everest took a blanket security interest in substantially all property, not a defined receivable pool, and preserved recourse through defaults, guaranties, accelerated balances, account-control provisions, and collection costs.

61. Everest did not identify any specific account debtor, invoice, receivable, maturity, obligor, collection history, or asset pool that it purchased from Revival.

62. Everest had no ordinary obligation to service or collect identified receivables directly. It collected fixed amounts from Revival's general operating account and left Revival bearing customer nonpayment risk.

63. Everest's risk was derivative credit risk—the risk that Revival could not pay—not direct collection risk in an owned receivable. *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 334–36 (2021).

**B. The Six Purported Purchases Were Fixed-Term Loans**

64. On September 14, 2022, Everest transmitted and funded a Revenue Based Financing Agreement stating a $20,000 purchase price, $28,400 purchased amount, $227.20 weekday debit, and 15% purchased percentage.

65. The $28,400 balance divided by the $227.20 debit equals exactly 125 weekday payments. Everest withheld $725 in fees and delivered $19,275.

66. On October 6, 2023, Everest funded a second form stating a $50,000 purchase price, $74,000 purchased amount, $528.57 weekday debit, and 15% purchased percentage.

67. The $74,000 balance was engineered to retire in approximately 140 weekday payments. Everest withheld $1,245 and delivered $48,755.

68. On February 2, 2024, Everest funded a third form stating a $70,000 purchase price, $103,600 purchased amount, $647.50 weekday debit, and 15% purchased percentage.

69. That balance divided by the debit equals exactly 160 weekday payments. Everest withheld $1,740, paid itself $30,657.26 from the nominal advance, and delivered only $37,602.74 in new cash.

70. On August 20, 2024, Everest funded a fourth form stating a $70,000 purchase price, $96,600 purchased amount, $603.75 weekday debit, and 9% purchased percentage.

71. That balance again divided by the debit equals exactly 160 weekday payments. Everest withheld $1,740, paid itself $12,011.79, and delivered $56,248.21.

72. On January 16, 2025, Everest funded a fifth form stating a $150,000 purchase price, $198,000 purchased amount, $1,042.11 weekday debit, and 13% purchased percentage.

73. The balance was structured to retire in approximately 190 weekday payments. Everest withheld $2,645, paid itself $31,867.50, and delivered $115,487.50.

74. On May 20, 2025, Everest funded a sixth form stating a $200,000 purchase price, $264,000 purchased amount, $1,147.83 weekday debit, and 17% purchased percentage.

75. The balance was structured to retire in approximately 230 weekday payments. Everest withheld $2,645, paid itself $107,609.40, and delivered only $89,745.60—less than 45% of the stated purchase price—as new cash.

76. Each renewal included or incorporated a payoff requirement under which Everest's existing balance had to be paid in full from the new transaction.

77. The fixed payoff periods were not merely projections produced by a fluctuating receivables stream. They were the direct arithmetic result of pairing a fixed purchased amount with a fixed weekday debit.

78. The following schedule summarizes the eight Everest transactions and the escalating self-payoff cycle.

| Date / Form | Gross | Everest payoff | Cash to Revival | Total repayment | Periodic debit | Fixed payments |
|---|---|---|---|---|---|---|
| 9/14/22 MCA | $20,000 | $0 | $19,275.00 | $28,400 | $227.20 daily | 125 |
| 10/6/23 MCA | $50,000 | $0 | $48,755.00 | $74,000 | $528.57 daily | 140 |
| 2/2/24 MCA | $70,000 | $30,657.26 | $37,602.74 | $103,600 | $647.50 daily | 160 |
| 8/20/24 MCA | $70,000 | $12,011.79 | $56,248.21 | $96,600 | $603.75 daily | 160 |
| 1/16/25 MCA | $150,000 | $31,867.50 | $115,487.50 | $198,000 | $1,042.11 daily | ≈190 |
| 5/20/25 MCA | $200,000 | $107,609.40 | $89,745.60 | $264,000 | $1,147.83 daily | ≈230 |
| 11/20/25 Loan | $200,000 | $112,803.60 | $84,551.40 | $266,000 | $1,131.91 daily | 235 |
| 3/19/26 Loan | $295,000 | $169,739.89 | $121,915.11 | $389,400 | $1,497.69 daily | 260 |

79. The six MCA forms delivered $367,114.05 in external cash after fees and internal payoffs, while Everest imposed $764,600 in face obligations.

80. Internal payoff credit is value furnished for principal-accounting purposes but also proves the hamster wheel: $182,145.95 of nominal MCA advances never reached Revival and instead retired Everest's own earlier balances.

81. Each form disclaimed any repayment schedule while contemporaneously fixing the only two numbers necessary to calculate one: the face balance and the weekday debit.

82. Each form described the debit as an estimate based on monthly sales. But the transaction sequence shows that the stable relationship was between advance size, factor return, and selected payoff days—not a contingent collection of a percentage of identified receivables.

83. Everest increased the stated monthly sales from $45,046.74 in 2022 to $116,629.35, $141,477.44, $155,552.91, and $180,989.33, before decreasing the estimate to $156,106.10 in May 2025. The payment was nevertheless fixed until a completed monthly application produced a prospective change.

84. The amounts collected were not automatically reconciled to those changing sales figures. Everest took the same debit each weekday and credited it toward a fixed purchased amount.

**C. Reconciliation Was Prospective, Burdensome, and Contrary to Everest's Actual Collection Policy**

85. The MCA forms allowed only one reconciliation request per calendar month and required a written request, the most recent complete monthly bank statement, and any further information Everest requested.

86. Everest promised an adjustment only after its "reasonable verification" and only "on a going-forward basis."

87. The forms did not require Everest to calculate what percentage of receipts it had actually taken since the preceding reconciliation, return overcollections, credit historical overpayments, or shorten the face balance.

88. A true purchase requires an accounting mechanism that binds the purchaser to receive only the purchased percentage, including a retrospective refund or credit when fixed debits exceed that percentage. *Togut*, 2026 Bankr. LEXIS 1850, at *20–26.

89. Everest's clause does not do that. It allows the fixed debt to accumulate regardless of past receipts and changes only future cash-flow timing after a paperwork and verification process controlled by Everest.

90. Everest's October 17, 2025 public marketing represented that its revenue-based payments are tied to revenue, not fixed, and "adjust automatically" when business slows.

91. In the same 2023 interview, Crockett described the asserted economic premise of Everest's product: Everest purportedly owned a small percentage of sales, and if sales declined, "we go for the ride with them," giving merchants "shock absorbers."

92. Crockett illustrated the point with a $10,000 restaurant advance remitting 3% of daily revenue until $12,000 was remitted. He said repayment might take about one year, or 18 months if business slowed.

93. Crockett also promoted revenue-based financing as available without personal guaranties or hard collateral. Revival's Everest forms instead imposed personal guaranties, blanket liens, fixed weekday debits, and default remedies.

94. The contract did not provide an automatic adjustment. The merchant had to recognize the overcollection, wait until it possessed a complete monthly statement, apply once in that month, supply additional information, and await Everest's verification.

95. By July 2026, Revival's cash flow had deteriorated. Revival provided June and July-to-date bank information and requested a 30-day deferment.

96. Everest refused to pause or stop payments and said the only available hardship relief was a four-week modified arrangement.

97. Everest first proposed $899 daily. The written modification instead required $2,500 weekly from July 13 through August 3, 2026, while recycled text inconsistently referred to payment on each business day.

98. Everest stated that the difference between the contract debit and temporary reduced amount would become past due, ideally payable in a lump sum or two further payments after the modification.

99. That response proves that reduced receipts did not reduce the amount Everest owned or the total repayment obligation. They merely produced arrears on a fixed debt.

100. The modification itself called the operative relationship a Revenue Based Financing Agreement, Revival a Seller, Everest a Buyer, and the transaction a purchase of future payment rights—even though the operative March 2026 document expressly called the relationship a commercial loan.

101. Everest's forms and practices thus toggle between sale language and loan language without changing the repayment engine.

**D. Everest Knowingly Approved Stacked Positions**

102. Revival also entered three Redwood Business Loans transactions dated September 17, 2025, January 20, 2026, and May 20, 2026.

103. The September 2025 Redwood position was active when Everest made the November 2025 loan. The January 2026 Redwood position overlapped the November Everest loan and was active when Everest made the March 2026 loan. The May 2026 Redwood position overlapped the March Everest loan.

104. The Redwood documents imposed fixed daily ACH payments and disclosed rollover payoffs. Those withdrawals appeared in the bank records Everest required and monitored.

105. Everest could also identify prior funding through its bank-data review, deposit-account access, payoff history, credit investigation, and blanket-lien underwriting.

106. Everest nonetheless approved additional positions and continued daily debits against the same Texas operating cash.

107. During the July 2026 hardship discussions, Everest's employee asked: "What is Redwood doing to assist you?" The question confirms actual knowledge of the stacked lender and coordinated pressure on the same cash flow.

108. During that July 2026 hardship process, Everest delayed meaningful relief while waiting to *see* what Redwood would do, even though Everest had current statements and Plaid visibility into Revival's actual receipts. The delay increased default pressure rather than automatically reducing remittances to the contracted percentage of revenue.

109. Upon information and belief, Everest's underwriting tolerates multiple positions when its pricing and daily collection model predicts sufficient short-term cash flow, notwithstanding contractual language that permits Everest to treat additional financing or account changes as defaults.

110. This structure turns stacking into a default accelerant. Everest approves the additional burden with access to the bank evidence, then preserves default, guaranty, lien, and collection remedies when the aggregate debits become unsustainable.

111. The stacked loans and renewals kept Revival on the hamster wheel and made additional refinancing foreseeable rather than accidental.

**E. Everest Changed Forms After Texas Regulated Sales-Based Financing**

112. Texas adopted Finance Code Chapter 398 through H.B. 700, effective September 1, 2025.

113. Chapter 398 applies to online commercial sales-based financing offered to a recipient in Texas, regardless of the provider's physical presence. Tex. Fin. Code § 398.002.

114. It provides that a sales-based financing transaction is not an account purchase transaction for purposes of the conclusive-characterization safe harbor in section 306.103. *Id.* § 398.004.

115. It further prohibits a provider or broker from establishing an automatic deposit-account debit mechanism unless it holds a validly perfected first-priority security interest in the recipient's account. *Id.* § 398.056.

116. Chapter 398 states that it creates no private right of action. Revival invokes sections 398.004 and 398.056 as evidence of Texas's public policy and the motive for Everest's form switch, not as a standalone claim for damages or civil penalties.

117. Everest's preexisting program depended on daily automatic debits. Revival's existing Redwood and other positions made first-priority status a material underwriting and legal issue.

118. After September 1, 2025, Everest stopped presenting its Revenue Based Financing Agreement to Revival and used a Commercial Loan and Security Agreement instead.

119. The November 20, 2025 agreement states $200,000 principal, $2,645 upfront fee, $66,000 precomputed interest, $266,000 total repayment, $1,131.91 daily payment, 235 payments, and an October 29, 2026 maturity.

120. Everest paid itself the then-current prior balance from the stated principal and delivered the remainder as new cash. The precise final allocation, including daily payoff changes between contract transmission and funding, is reflected in Everest's funding ledger.

121. On November 19, 2025, Everest specialist Alfredo Zamora confirmed in writing that "the contract won't reflect the fees being covered by Shield." He stated that the transmitted contract would show $83,403.57 net, but funding would be $86,048.57 because Shield would cover $2,645 in fees.

122. Shield Funding and Eli Miller, the ISO or broker, covered or reimbursed the $2,645 from Shield's commission. Everest retained its full contractual economics and left the agreement unchanged. The payment is a credit to Revival, not a reduction of Everest's stated principal, precomputed interest, face balance, or fixed payment schedule.

123. The November agreement facially imposed $66,000 in precomputed interest and stated an additional $2,645 fee. Revival credits Shield's separate $2,645 payment in calculating any net recovery, but Everest did not amend the agreement, reduce the $266,000 face obligation, or rebate any of the $66,000 precomputed interest.

124. The March 19, 2026 agreement states $295,000 principal, $3,345 upfront fee, $94,400 precomputed interest, $389,400 total repayment, $1,497.69 daily payment, 260 payments, and an April 5, 2027 maturity.

125. The March transaction delivered $121,915.11 in cash after Everest withheld fees and paid itself $169,739.89. It imposed $97,745 in contracted finance charges against the amount financed.

126. The Office of Consumer Credit Commissioner's published weekly ceilings show an 18% commercial ceiling for the weeks containing November 20, 2025 and March 19, 2026.

127. Using the stated net amounts financed and equal weekday-payment schedules, the estimated nominal annual rates are approximately 69.5% and 60.7%; the corresponding effective annual yields are approximately 100.1% and 83.4%.

128. Texas Finance Code section 306.004 requires commercial-loan interest to be amortized or spread using the actuarial method over the stated term. On that method, both loans exceed twice the 18% enforceable rate.

129. Everest's own documents make usurious intent and contracted interest facially calculable. The November loan labels $66,000 as precomputed interest; the March loan labels $94,400 as precomputed interest; both withhold additional upfront compensation.

**F. The Utah Recitals Are a Sham Choice of Law**

130. Each Texas loan form says it is governed by federal and Utah law and recites that the agreement was "approved, made, and funded," and that all necessary documents were accepted, in Utah.

131. The operative facts point elsewhere. Revival is a Texas LLC operating in Texas; its owner signed for a Texas business; the deposit account and ACH performance are in Texas; the collateral and economic injury are in Texas; and Everest designed a term-loan product expressly marketed to Texas businesses.

132. Everest's official principal address is in New York. Its parent and management records identify New York and Florida operations. The preceding six transactions used Everest's New York address and New York law.

133. The NMLS Consumer Access record for EBF Holdings LLC, NMLS ID 2454526, displayed an original-issue date of July 16, 2026 for its Utah DFI Commercial Financing Registration—after both the November 20, 2025 and March 19, 2026 Utah-form loans.

134. The same record listed 12496 N.W. 25th Street, Miami, Florida as EBF's street and mailing address, listed no branch locations, and did not list the Murray, Utah address printed on the two loan forms.

135. Utah Code § 7-27-201 has required a provider engaging in commercial financing in Utah or with a Utah resident to maintain a valid registration since January 1, 2023. Thus, if Everest's recital that it approved, made, and funded these loans in Utah is true, the public registration date places both transactions before Everest's displayed registration; if the recital is not true, it supplies no Utah contact. Either alternative undermines the Utah choice-of-law device.

136. Crockett's 2023 interview further showed his knowledge of annualized-rate consequences. He stated that estimated-APR disclosures in New York and California affected product demand by "exactly zero percent," while calling estimated APR a "Trojan horse" for future rate caps.

137. Everest's own website does not market the product as a Utah loan for Utah businesses. It says: "Proudly Offering Business Term Loans for Texas Businesses" and states that Everest is "now offering business term loans for Texas-based businesses."

138. The website states that more states are "coming soon," supporting the inference that the product was created state by state in response to state regulatory requirements.

139. The loan form's page-17 addendum exposes the recycled structure. The November 2025 loan was followed by a page titled "Addendum to Revenue Based Financing Agreement" and stated that, as a condition of a "purchase of future payment rights," Everest's current balance had to be paid off entirely.

140. The March 2026 addendum changed the title to Commercial Loan and Security Agreement but retained the same mandatory self-payoff mechanism.

141. Everest cannot manufacture Utah contacts by reciting that its own internal approval occurred there while directing a Texas-specific product to a Texas borrower and collecting every payment from Texas.

142. Texas has the materially greater relationship to the loan issue, and application of Utah law to validate rates exceeding twice the Texas ceiling would violate a fundamental Texas policy.

143. Article XVI, section 11 of the Texas Constitution expressly addresses usury. Finance Code section 302.001 declares usurious contracts contrary to public policy. Sections 303.009 and 305.001 regulate and remedy commercial usury.

144. *Fleetwood* held that this constitutional and statutory framework establishes Texas's fundamental policy against excessive commercial interest regardless of the debtor's business character. 374 F. Supp. 3d at 371–72.

145. Under Restatement (Second) of Conflict of Laws § 187(2), *Brown & Brown, Inc. v. Johnson*, 25 N.Y.3d 364, 368–70 (2015), and *Fleetwood*, the Utah selection must be disregarded for the Texas usury issue.

146. The choice also fails on its stated facts. Upon information and belief, the material negotiations, borrower execution, receipt of funds, ACH performance, collateral, and injury did not occur in Utah.

147. If Everest instead contends that the relationship remained revenue-based financing, that contention places the transaction within Chapter 398's regulatory classification and underscores the first-priority issue, although Revival seeks no private statutory remedy under

that chapter. Everest may not use “loan” to avoid Chapter 398 and “Utah” to avoid Texas loan law.

**G. New York Law Governs Revival’s MCA Agreements**

148. Each of Revival’s six Revenue Based Financing Agreements selected New York law.

149. Everest is a New York-centered business for this program: it listed a Manhattan business and notice address, selected New York law, and reserved New York as an enforcement forum.

150. New York applies substance over form. A transaction is a loan when repayment is absolute and the purported purchaser does not bear genuine receivables risk. *Adar Bays*, 37 N.Y.3d at 334–36; *Fleetwood Services, LLC v. Richmond Capital Group LLC*, 2023 WL 3882697, at *2 (2d Cir. June 8, 2023).

151. Courts consider reconciliation, a finite or de facto term, recourse in bankruptcy, the good faith of the estimated payment, collateral, guaranties, and the transaction’s allocation of collection risk. *Davis v. Richmond Capital Group, LLC*, 194 A.D.3d 516, 517 (1st Dep’t 2021).

152. *People v. Richmond* affirmed that fixed daily payments unrelated to actual receivables, nonfunctioning reconciliation, broad defaults, and enforceable guarantees supported loan treatment and clear usurious intent. 246 A.D.3d at 585–88.

153. *Togut* held purported purchases to be loans as a matter of law where fixed daily debits created a de facto term, reconciliation was prospective rather than retrospective, broad defaults and collateral preserved recourse, and no identifiable receivable risk was transferred. 2026 Bankr. LEXIS 1850, at *20–46.

154. Everest's six transactions present those features as a course of dealing, not merely labels on one form.

155. Using the net value financed after stated fees, the fixed weekday debits, and 260 payment days per year, the six MCA forms produce estimated nominal annual rates ranging from approximately 69% to 172%. Each exceeds New York's 25% criminal-usury ceiling and twice that enforceable ceiling for RICO purposes.

156. Everest knowingly collected those fixed returns through interstate ACH debits, internal rollover payoffs, fees, and account-control remedies.

**H. Damages and Accounting**

157. For the completed six MCA transactions, principal value furnished after stated fees was $549,260, including internal satisfaction of prior principal balances. Total repayment obligations were $764,600. The resulting finance charges were $215,340.

158. For the completed November 2025 loan, the amount financed after the withheld fee was $197,355 and total repayment was $266,000. The finance charge was $68,645.

159. Completed Everest finance charges through the November 2025 loan therefore total at least $283,985 on the agreement-derived schedule, before crediting Shield's separate $2,645 payment and before the March 2026 loan's paid interest, ACH charges, default charges, bank fees, and consequential injury.

160. Threefold that completed-charge figure is $851,955. Revival pleads its remedies in the alternative and does not seek duplicative recovery.

161. For the November loan, Revival's preliminary estimate applying an 18% actuarial ceiling to the agreement-derived amount financed and 235-payment term yields a maximum

lawful repayment of approximately $213,912.35 and contracted excess of approximately $52,087.65.

162. For the March loan, the same preliminary method yields maximum lawful repayment of approximately $318,791.67 and contracted excess of approximately $70,608.33. Three times that excess is approximately $211,825.

163. *People v. Richmond* requires restitution to exclude principal and avoid double recovery. Revival's calculation does so by treating the gross value furnished, including valid prior-principal satisfaction, as principal and isolating stated factor spread and fees as finance charges.

164. Revival seeks an accounting and reserves the right to amend the damages schedule after obtaining the full ledger and bank records.

**FIRST CAUSE OF ACTION**
**(Civil RICO — Conducting the Everest Enterprise Through Collection of Unlawful Debt; Against Crockett)**

165. Revival repeats and realleges each preceding paragraph.

166. Crockett is a "person" within 18 U.S.C. §§ 1961(3) and 1962(c), legally distinct from the EBF corporate enterprise he controls.

167. Everest is an enterprise under 18 U.S.C. § 1961(4) engaged in and affecting interstate commerce through nationwide funding, interstate DocuSign transmissions, wires, ACH debits, bank-data access, ISO referrals, and collections.

168. Crockett participated in the operation or management of Everest's affairs by establishing, authorizing, directing, or ratifying its standardized products, rate and term architecture, New York and Utah forms, Texas conversion, underwriting, renewal, reconciliation, ACH, lien, guaranty, and collection policies.

169. Crockett conducted the enterprise through the collection of unlawful debt. The challenged obligations were incurred in connection with Everest's business of lending money; were unenforceable in whole or part because of New York or Texas usury law; and carried rates at least twice the enforceable rates.

170. Revival's six New York-law MCA debts were fixed, absolutely repayable loans in substance and imposed returns exceeding the criminal-usury and RICO thresholds, subject to transaction-level proof.

171. Revival's two Texas loan debts expressly labeled their interest, imposed actuarial rates far above the applicable 18% ceiling, and exceeded twice that ceiling.

172. Everest repeatedly collected the debts through weekday ACH withdrawals, self-payoff rollovers, fees, settlement and modification demands, and threatened default remedies.

173. The conduct was not isolated. It extended across eight Revival transactions and formed part of Everest's nationwide standardized program and more than 1,800 ISO relationships.

174. Crockett knew the economic terms because the agreements and internal payoff schedules facially stated the advances, fees, fixed face amounts, periodic debits, payment counts or maturity dates, prior-balance payoffs, and precomputed interest.

175. Crockett also knew or consciously disregarded that Everest's sale language, automatic-adjustment marketing, actual arrears practice, and Texas-specific loan conversion were inconsistent.

176. By reason of Crockett's section 1962(c) violation, Revival suffered direct injury to business and property, including unlawful finance charges, fees, ACH collections, inflated

rolled balances, lost use of money, bank charges, impaired credit and financing, and costs of protecting operating accounts.

177. Revival is entitled to threefold damages, costs, and reasonable attorneys' fees under 18 U.S.C. § 1964(c), together with appropriate declaratory and equitable relief.

**SECOND CAUSE OF ACTION**
**(Civil RICO — Conducting the Whetstone–Everest Funding Enterprise Through Collection of Unlawful Debt; Against Everest)**

178. Revival repeats and realleges each preceding paragraph.

179. Everest is a "person" within 18 U.S.C. §§ 1961(3) and 1962(c).

180. The Whetstone–Everest Funding Enterprise is an association-in-fact consisting of Whetstone Holdings, Everest, Crockett, Everest's ISO network including ISO No. 142, and the servicing, ACH, bank-data, and collection participants used to originate and collect the challenged products.

181. The enterprise has a common purpose: originate, renew, service, and collect high-return small-business financing through standardized forms and centralized bank-account control while classifying each transaction in the manner most favorable to collection and regulatory avoidance.

182. The enterprise has relationships among its participants. Whetstone is Everest's parent; Crockett controls both; ISOs submit merchant applications and bank statements; Everest underwrites, documents, and funds; ACH and bank-data participants enable fixed debits and monitoring; and collection personnel enforce payment and modifications.

183. The enterprise has longevity independent of the eight Revival transactions. Everest was founded in or about 2013, reports billions in nationwide originations, maintains renewal and servicing systems, and continues to market the challenged products.

184. The association is distinct from Everest alone because it includes separate corporate, natural-person, ISO, processor, and servicing participants with roles beyond Everest's own legal existence.

185. Everest conducted and participated in the enterprise's affairs by receiving referrals and bank records, underwriting and approving stacked positions, transmitting forms, funding and refinancing transactions, retaining self-payoffs and fees, initiating ACH debits, modifying collections, and invoking liens and guaranties.

186. Everest conducted those affairs through repeated collection of the unlawful debts alleged in Count I.

187. Everest's interstate transmissions also furthered a scheme to characterize fixed loans as contingent sales, to recite that Texas transactions occurred entirely in Utah, and to obtain and collect payments through those representations.

188. Revival identifies the relevant transmissions with particularity: the eight dated DocuSign agreements; the funding wires on or about those dates; the recurring weekday ACH instructions and debits; the July 7–10, 2026 hardship emails; and the July 2026 modification transmitted electronically.

189. The false or misleading present-fact statements included that no payment schedule or term existed, that fixed debits represented genuine receivables estimates, that revenue-based payments automatically adjusted, and that the Texas loans were approved, made, funded, and accepted in Utah.

190. Everest knew its actual fixed-day arithmetic, prospective-only reconciliation, self-payoff renewal program, collection policy, operational locations, and transaction data.

191. By reason of Everest's section 1962(c) violation, Revival suffered the direct business and property injuries alleged above.

192. Revival is entitled to threefold damages, costs, reasonable attorneys' fees, and all other relief authorized by 18 U.S.C. § 1964(c).

## THIRD CAUSE OF ACTION
**(Civil RICO Conspiracy — 18 U.S.C. § 1962(d); Against Both Defendants)**

193. Revival repeats and realleges each preceding paragraph.

194. Defendants knowingly agreed with each other and with Whetstone and other enterprise participants to further an endeavor that, if completed, would violate section 1962(c) through collection of unlawful debt and the interstate transmissions alleged above.

195. Crockett supplied control, policy, authorization, and management. Everest supplied the contracts, underwriting, funding, ACH system, payoffs, servicing, modifications, liens, guaranties, and collections.

196. The agreement is shown by their repeated coordinated roles, common forms, parent-control structure, ISO program, centralized records, fixed pricing, renewal payoffs, Texas form switch, and continuing collection activity.

197. Defendants knew the essential nature of the scheme and agreed to facilitate its objective of originating and collecting fixed-return obligations under sale or loan labels selected to evade the applicable law.

198. Overt acts included each contract transmission, funding wire, internal payoff, ACH debit, bank-data review, hardship communication, modification, lien assertion, and collection demand.

199. Revival was directly injured in business and property by reason of the conspiracy and is entitled to relief under 18 U.S.C. § 1964(c).

**FOURTH CAUSE OF ACTION**
**(Declaratory Judgment Concerning Transaction Character, Governing Law, and Enforceability; Against Both Defendants)**

200. Revival repeats and realleges each preceding paragraph.

201. An actual controversy exists concerning the character, governing law, validity, balance, and enforceability of the eight agreements, rollover payoffs, guaranties, ACH authorizations, security interests, and collection rights.

202. The six New York-law MCA transactions were loans in substance because repayment was fixed and absolute, reconciliation did not provide a mandatory retrospective true-up, the payment amounts created de facto terms, Everest took blanket recourse, and no identifiable receivables risk was transferred.

203. The two Commercial Loan and Security Agreements are loans by their express terms and substance.

204. Texas law governs the Texas loans' usury issues, and the Utah clauses and all-in-Utah recitals are invalid or unenforceable to the extent they would defeat Texas's fundamental policy.

205. Texas Finance Code Chapter 398, including sections 398.004 and 398.056, supplies relevant Texas public policy and classification evidence; Revival does not assert a private cause of action under that chapter.

206. The November 2025 and March 2026 balances, fees, ACH rights, guaranties, and security interests are void, unenforceable, or subject to reduction to the extent they embody usurious interest or depend on an invalid choice of law.

207. The March 2026 loan remains active and Everest continues to assert collection rights. Declaratory relief will resolve the parties' present conduct and legal relations.

208. Revival seeks declarations consistent with the foregoing, an accounting that eliminates unlawful balances and charges, and appropriate directions concerning ACH authority, liens, guaranties, and enforcement.

## PRAYER FOR RELIEF

WHEREFORE, Revival respectfully requests judgment against Defendants as follows:

i. Declaring that the six challenged revenue-based financing transactions are loans in substance and that the two commercial loan transactions are loans by form and substance;

ii. Declaring that New York law governs Revival's six MCA agreements and that Texas law governs Revival's Texas-loan usury issues notwithstanding the Utah provisions;

iii. Declaring that the Utah choice-of-law provisions and all-in-Utah recitals are invalid or unenforceable to the extent alleged;

iv. Declaring the unlawful balances, interest, fees, ACH rights, guaranties, security grants, and collection rights void, reducible, or unenforceable to the extent provided by governing law;

v. Ordering a complete accounting of every advance, fee, payoff, ACH debit, adjustment, refund, credit, settlement, write-off, lien, and amount claimed for Revival;

vi. Awarding actual damages trebled under 18 U.S.C. § 1964(c);

vii. Awarding restitution and recovery of money had and received in the alternative, with full credit for principal and no double recovery;

viii. Awarding prejudgment and post-judgment interest;

ix. Awarding costs, disbursements, and reasonable attorneys' fees under 18 U.S.C. § 1964(c) and other applicable law;

x. Enjoining Defendants, to the extent authorized after merits adjudication, from enforcing unlawful balances, debits, liens, guaranties, or choice-of-law provisions against Revival;

xi. Preserving all underwriting, bank-data, transaction, funding, ISO, commission, ACH, reconciliation, modification, UCC, collection, and enterprise records; and

xii. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Revival demands a trial by jury on all claims and issues so triable.

Dated: New York, New York
August 24, 2026

HESKIN & PROPER, PLLC

By: /s/ *Shane R. Heskin*
Shane R. Heskin
641 Lexington Avenue, 14th Floor
New York, New York 10022
shane@heskinproper.com
Attorney for Plaintiff